IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NEBRASKA BEEF, LIMITED | § | |
| | § | |
| VS. | § | CIVIL ACTION 4:03-CV-1486-Y |
| | § | |
| KBK FINANCIAL, INC. | § | |

ORDER REGARDING CROSS-MOTIONS FOR SUMMARY-JUDGMENT

Pending before the Court are plaintiff Nebraska Beef, Limited ("Nebraska Beef")'s Motion for Summary Judgment [doc. # 25] and defendant KBK Financial, Inc. ("KBK")'s Motion for Summary Judgment [doc. # 27]. Having carefully reviewed the motions, the Court concludes that Nebraska Beef's motion should be DENIED and that KBK's motion should be GRANTED.

## I. BACKGROUND

KBK provides working capital, asset-based financing, and other financial products to businesses in need of operating capital. One such business was Red Oak Farms, Inc. ("Red Oak"). KBK and Red Oak executed a Loan Agreement, Security Agreement, and Account Transfer and Purchase Agreement ("the KBK Purchase Agreement") (collectively, "the KBK Agreement") under which KBK obtained a first-priority security interest in certain Red Oak assets, including all of Red Oak's accounts receivable; inventory; contract rights; deposit accounts; all money and other funds of Red Oak that were or came into the possession, custody, or control of Red Oak; and farm products and proceeds thereof (in essence, Red Oak's collateral). (Def.'s Mot. App. at 40.) KBK perfected its security interest in this

collateral by filing financing statements in Iowa and Nebraska on April 27, 1998.

Pursuant to the terms of the KBK Purchase Agreement, Red Oak agreed (1) to offer to KBK certain of its accounts arising out of sales of goods or services rendered by Red Oak; and (2) to sell to KBK those accounts KBK accepted. (*Id.* at 37 (KBK Purchase Agreement).) Red Oak would deliver to KBK a written assignment of the accounts accepted by KBK along with a copy of all related invoices and evidence of delivery. (*Id.* at 38.) For an account to be eligible for KBK's acceptance, its invoices had to set forth as the sole address for payment a post-office box ("the KBK lockbox") or bank account (for wire transfers) controlled by KBK. (*Id.*) KBK had exclusive control over the KBK lockbox. (*Id.* at 5, ¶ 6 (affidavit).) Regardless of whether KBK purchased an account, all payments on Red Oak invoices by Red Oak customers had to be made to the KBK lockbox. (*Id.*) When a Red Oak customer paid for its goods as to an account purchased by KBK, KBK would deduct the amount it was due and disburse the balance to a reserve account maintained by KBK ("the Reserve"). When a Red Oak customer paid on an account KBK did not purchase, KBK remitted all or some of that payment to the Reserve.

Thus, the Reserve contained funds from two sources: the balance paid on purchased invoices after deduction of the amount KBK was due and payments made by Red Oak customers on non-purchased invoices. (*Id.* at 5, ¶ 7 (affidavit).) KBK had a right to withhold and accumulate residual payments to maintain the Reserve. (*Id.* at 39-40 (the KBK Purchase Agreement).) KBK routinely disbursed funds in the

Reserve to Red Oak when Red Oak was not in default and KBK deemed itself secure. (*Id.* at 5, ¶ 7 (affidavit).) To make such a disbursement, KBK would wire funds to an account designated by Red Oak at a bank in Omaha ("the RO lockbox"). (*Id.*) KBK assumed that the RO lockbox was under the exclusive control of Red Oak. (*Id.*)

Red Oak was in the business of buying cattle from producers, having it slaughtered and processed by one or more third parties, and then selling the resulting beef products to its customers. Prior to October 2, 2000, Nebraska Beef was one of the third parties that slaughtered and processed cattle for Red Oak. In October 2000, because of financial difficulties being encountered by Red Oak, Red Oak and Nebraska Beef entered into a new agreement ("the NB Agreement") and a purchase agreement ("the NB Purchase Agreement") that created a new financial relationship between the two. Pursuant to the NB Agreement, Nebraska Beef would purchase cattle from Red Oak's producers and then slaughter and process them; Red Oak would sell the resulting beef products to its customers. Though Nebraska Beef had purchased the beef, boxed it, and shipped it, Nebraska Beef would not bill the recipient (Red Oak's customer) directly. Instead, Nebraska Beef would bill Red Oak and Red Oak would bill its customer.

The NB Agreement provided that Red Oak would "assign its contract rights, accounts receivable and the proceeds therefrom, to Nebraska Beef to secure the payment of any and all indebtedness that may be owing from [Red Oak] to Nebraska Beef." (*Id.* at 157 (NB Agreement).) It also stated that Nebraska Beef would obtain a lien on Red Oak's boxed-beef inventory and related contract rights, accounts

receivables, and the proceeds therefrom. (*Id.* at 159, ¶ 12.) Moreover, "Nebraska Beef w[ould] continue to enjoy a perfected first security interest in all fresh [Red Oak] boxed-beef inventory, accounts receivable and the proceeds therefrom, which it processes and sells to [Red Oak]." (*Id.* at 162, ¶ 28.)

One provision of the NB Agreement stated that "[a]ll fresh boxed beef inventory repurchased by [Red Oak] from Nebraska Beef shall remain the property of Nebraska Beef until paid for by [Red Oak]." (*Id.* at 159, ¶ 10.) The NB Agreement also provided, however, that "Nebraska Beef will transfer title and risk of loss to [Red Oak] as product is shipped from its loading dock and invoiced to the [Red Oak] customer." (*Id.* at 160, ¶ 14.) Red Oak would invoice its customers the same day Nebraska Beef billed Red Oak. (*Id.* at 160, ¶ 13.) Red Oak customers were to remit their payments to the RO lockbox based on invoices for the beef purchased and slaughtered by Nebraska Beef, which invoices were to note and require that method of payment. (*Id.* at 160, ¶ 17; 167, ¶ B4 (NB Purchase Agreement); 3, ¶ 8 (affidavit); 6-7, ¶ 11 (same).)

Nebraska Beef filed financing statements for its security interest in Red Oak's collateral in October 2000. (*Id.* at 204 (financing statement); 213 (interrogatory).) One financing statement covered boxed-beef inventory, related accounts receivables, contract rights, and general intangibles. (*Id.* at 204 (financing statement).)[1]

The NB Security Agreement also contained a condition precedent whereby Nebraska Beef's obligations to extend credit were made subject

[1] The Court was directed to only one financing statement in the record.

to the proper delivery to and execution of a subordination agreement by any existing secured creditor of Red Oak. (*Id.* at 168-69, ¶ F (NB Purchase Agreement).) Each existing Red Oak secured creditor had to subordinate its respective secured position to that of Nebraska Beef. (*Id.*) Red Oak also "agree[d] to do all necessary acts or things to ensure such priority of the liens in favor of [Nebraska Beef] including, but not limited to, the obtaining of properly executed subordination statements from all existing secured parties of [Red Oak]." (*Id.* at 169 (same).)

Red Oak requested that KBK subordinate its security interest to that of Nebraska Beef in all accounts receivable that were attributable to Red Oak's customers' purchase of beef slaughtered and boxed by Nebraska Beef. KBK refused. Nebraska Beef began its new financial relationship with Red Oak anyway; it did not notify KBK of its claimed security interest in the Red Oak collateral until December 27, 2000. Following its refusal to sign a subordination agreement, KBK continued to purchase Red Oak's accounts receivables and extend financial credit to Red Oak.

The present dispute arose between Nebraska Beef and KBK when, after Nebraska Beef and Red Oak entered into the NB Agreement, Red Oak customers, contrary to the instructions on their invoices, remitted a total of $325,439.20 to the KBK lockbox, not the RO lockbox, for Nebraska Beef boxed-beef products. Nebraska Beef contends that Red Oak customers mistakenly paid the sums due on these invoices to the KBK lockbox instead of to the RO lockbox and thus that the payments rightfully belong to Nebraska Beef. It also alleges

that, upon notifying KBK of the mistake, KBK refused to remit the payments to Nebraska Beef.

Nebraska Beef filed this suit against KBK but Red Oak is not a party. Nebraska Beef's claims are for conversion, tortious interference with contract, money had and received, and common-law fraud. The parties filed their cross-motions for summary judgment on March 21, 2004.

## II. STANDARD OF REVIEW

Summary judgment is proper when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir. 1945)). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990). Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Id.*; *Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990); *Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir. 1989). In making its determina-

tion on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the Court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

To prevail on a motion for summary judgment, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). A moving party may submit evidence that negates a material element of the respondent's claim or defense or show that there is no evidence to support an essential element of the respondent's claim or defense. *See Celotex Corp.*, 477 U.S. at 322-24; *Crescent Towing and Salvage Co. v. M/V Anax*, 40 F.3d 741, 744 (5th Cir. 1994); *Lavespere*, 910 F.2d at 178.

To negate a material element of the respondent's claim or defense, a moving party must negate an element that would affect the

outcome of the action. *See Anderson*, 477 U.S. at 247. If the moving party alleges that there is no evidence to support an essential element of the respondent's claim or defense, the moving party need not produce evidence showing the absence of a genuine issue of fact on that essential element. Rather, the moving party need only show that the respondent, who bears the burden of proof, has adduced no evidence to support an essential element of his case. *See Celotex*, 477 U.S. at 325; *Teply v. Mobil Oil Corp*., 859 F.2d 375, 379 (5th Cir. 1988).

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50.

## III. ANALYSIS

All of Nebraska Beef's claims rest upon its contention that it is entitled to and has a superior claim in the funds in question. Consequently, in order to shoulder its burden in response to KBK's

motion for summary judgment, which alleges that there is no evidence to support an essential element of Nebraska Beef's claims, Nebraska Beef must raise a genuine issue of fact regarding its superior entitlement to the funds.

KBK and Nebraska Beef are both secured parties of Red Oak and thus possess security interests in Red Oak's collateral. *See* TEX. BUS. & COM. CODE ANN. § 9.102(73) & (74) (Vernon 2002).[2] "A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral." *Id.* § 9.203(a). That occurs when (1) the secured party gives value; (2) the debtor has rights in the collateral; and (3) the debtor authenticates a security agreement that provides a description of the collateral. *See id.* § 9.230(b). Neither party disputes that all of these steps occurred as to both the KBK Agreement and the NB Agreement.

A secured party strengthens its rights to a debtor's collateral through perfection. Generally, a security interest in accounts and proceeds is perfected by the secured party's filing of a financing statement. *See id.* § 9.310(a). Where there is a dispute between two secured parties with perfected security interests in the same collateral, the secured party with the first-filed financing statement has the superior claim. *See id.* 9.322(a)(1). Consequently, assuming

---

[2] A security agreement "creates or provides for a security interest." TEX. BUS. & COM. CODE ANN. § 9.102(74) (Vernon 2002). A secured party is "a person in whose favor a security interest is created or provided for under a security agreement, whether or not any obligation to be secured is outstanding; . . . [or] a person to which accounts, chattel paper, payment intangibles, or promissory notes have been sold." *Id.* § 9.102(73). "Collateral" is "the property subject to a security interest," including accounts, chattel paper, payment intangibles, promissory notes that have been sold, and proceeds to which a security interest attaches. *Id.* § 9.102(12).

that their financing statements refer to the same collateral, KBK has a superior security interest to Nebraska Beef because KBK perfected its security interest in Red Oak's collateral prior to Nebraska Beef.[3]

Thus begins the legal wrangling in this suit. KBK argues that Nebraska Beef cannot shoulder its summary-judgment burden because KBK has a superior security interest to Nebraska Beef in Red Oak's collateral. Nebraska Beef counters that the funds in question are for products owned by Nebraska Beef (because Nebraska Beef never received payment for them from Red Oak), thus rendering KBK's security interest in Red Oak's collateral irrelevant.

Nebraska Beef cannot circumvent the fact that the funds in question were paid on Red Oak accounts, however. (Pl.'s Mot. App. Tab 1, Ex. E. (invoices).) An "account" is

> a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered.

TEX. BUS. & COMM. CODE ANN. § 9.102(a)(2) (LexisNexis 2005). In its most basic form, an account is "a right[] to payment relating to goods or services." *Id.* at § 9.102(a)(2) U.C.C. cmt. at 5.a. (Vernon 2002). The same definition applies to accounts receivable. *See Mbank El Paso Nat'l Ass'n v. Featherlite Corp.*, 792 S.W.2d 472, 475 (Tex. Civ. App.--El Paso 1990, pet. denied) ("The definition of 'account' is generally construed to include 'accounts receivable.'" (citation omitted)). "Where goods are sold or services rendered not for cash

---

[3] The Court notes that there are no allegations by either party that any of the financing statements in question are ineffective.

but on an open account, an account receivable is created." *Mbank*, 792 S.W.2d at 475 (citing *In re Cooper*, 2 B.R. 188, 192 (Bankr. S.D. Tex. 1980)). The funds remitted to the KBK lockbox that Nebraska Beef contends rightfully belongs to Nebraska Beef are therefore accounts receivable. Neither of the parties seems to dispute this classification (should Article 9 apply to the funds).

KBK has a prior perfected security interest in Red Oak's accounts receivable and thus a superior interest to Nebraska Beef in the funds in question. *See* TEX. BUS. & COMM. CODE ANN. § 9.322(a)(1) (Vernon 2002). Nebraska Beef argues that KBK's superior interest in Red Oak collateral is nondispositive because Nebraska Beef still owned the beef products for which Red Oak customers submitted payments to the KBK lockbox, thus depriving the resulting funds (the accounts receivable) of the status of Red Oak collateral.[4] As stated above, however, the funds were delivered to the KBK lockbox on Red Oak invoices, a fact that clearly classifies the funds as Red Oak collateral.

Moreover, Nebraska Beef cannot circumvent the provisions of

---

[4] Nebraska Beef's argument is based upon the ambiguous terms of the NB Agreement, which provided both that title of the boxed-beef products would pass to Red Oak upon shipment by Nebraska Beef and that "[a]ll fresh boxed beef inventory repurchased by [Red Oak] from Nebraska Beef shall remain the property of Nebraska Beef until paid for by [Red Oak]." (Def. Mot. App. at 159, ¶ 10; 160, ¶ 14.) Parol evidence indicates that Nebraska Beef and Red Oak intended for the boxed-beef products to remain Nebraska Beef's property until Nebraska Beef received payment. (Pl. Mot. App. Tab 1 at 3 (Fromi Aff.); Tab 2 at 82:5-82:13 (Reisinger Dep.); Tab 3 at 86:11-88:6 (Arnold Dep.).) Parol evidence, or "'evidence given orally,'" *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 432 (5th Cir. 2003) (citing Black's Law Dictionary 579 (7th ed. 1999)), is admissible in this instance because "when the terms of a written agreement are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity or to show the intention of the parties." *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 563 (5th Cir. 2005) (citation omitted).

Chapter 9 of the Texas Business & Commerce Code ("the Code") by arguing that its entitlement to the funds is based upon ownership rather than a security interest. First, though Nebraska Beef directs its summary-judgment arguments away from any claim based upon its security interest in Red Oak collateral, Nebraska Beef's pleading clearly relies, at least in part, upon its security interest. More importantly, however, Chapters 2 and 9 of the Code render impossible Nebraska Beef's retention of *ownership* in the beef products shipped to Red Oak customers. Instead, what Nebraska Beef would retain, at most, would be a security interest in the boxed-beef: "[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." TEX. BUS. & COMM. CODE ANN. § 2.401(a) (Vernon 2002).[5] Thus, even assuming that the NB Agreement retained ownership--title--for Nebraska Beef in the boxed beef it produced for Red Oak until Nebraska Beef received payment, Nebraska Beef only would have retained at law no more than a security interest, which the Court has already concluded would be inferior to KBK's.

Because KBK has a superior security interest to the funds in question, and also because the KBK Agreement provided that all payments on Red Oak invoices and accounts were to be made to the KBK lockbox, Nebraska Beef cannot establish that KBK's current possession

[5] In summary, Article 2 of the Texas Business and Commerce Code "applies to transactions in goods." TEX. BUS. & COMM. CODE ANN. § 2.102 (Vernon 2002). "Goods" is "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." *Id.* at § 2.105(a). The definition is broad. *See Propulsion Techs. v. Attwood Corp.*, 369 F.3d 896, 900 (5th Cir. 2004) (citing *Assoc. Discount Corp. v. Rattan Chevrolet, Inc.*, 462 S.W.2d 546, 549 (Tex. 1970)).

of the funds in question is wrong or unlawful; nor can it demonstrate that it has a superior entitlement to the funds or that KBK must remit the funds to Nebraska Beef. Nebraska Beef therefore cannot shoulder its summary-judgment burden as to any of its claims either as movant or respondent. As respondent to KBK's motion, it has not raised a genuine issue of fact regarding its right to possession of the funds in question or KBK's "unlawful" possession of those same funds, thus foreclosing any conversion claim.[6] Nor has Nebraska Beef shown there to be a genuine question concerning KBK's interference with the NB Agreement, rendering unviable any claim for tortious interference with contractual relations.[7] KBK merely acted pursuant to the KBK Agreement and its superior security interest, thus establishing a justifiable cause or excuse for its conduct.[8] Furthermore, in

[6] "Conversion is the unauthorized and wrongful assumption and exercise of dominion and control of another's property inconsistent with his rights." *Emil v. Bures*, 806 S.W.2d 935, 938 (Tex. Civ. App.--Corpus Christi 1991, no pet.) (citation omitted). Under Texas law, to prove conversion, a plaintiff must show that: (1) the plaintiff owned, had legal possession, or was entitled to possession of personal property; (2) the defendant assumed and exercised dominion and control over the personal property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with plaintiff's rights; (3) the plaintiff made a demand for the property; and (4) the defendant refused to return the property. *See Ojeda v. Wal-Mart Stores, Inc.*, 956 S.W.2d 704, 707 (Tex. App.–-San Antonio 1997, pet. denied) (citation omitted).

[7] Under Texas common law, the elements of a cause of action for tortious interference with contractual relations are: (1) a contract; (2) an intentional act, calculated to cause damage to the plaintiff, that interferes with the contract; (3) such intentional act proximately causes the plaintiff actual damages; and (4) the lack of any justifiable cause or excuse on the part of the defendant. *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1037 (5th Cir. 1990) (citing *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275, 1298 (5th Cir. 1988) (footnote omitted); *Deauville Corp. v. Fed. Dept. Stores, Inc.*, 756 F.2d 1183, 1194 (5th Cir. 1985)).

[8] "Under the defense of legal justification or excuse, one is privileged to interfere with another's contract (1) if it is done in a bona fide exercise of his own rights, or (2) if he has an equal or superior right in the subject matter to that of the other party." *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 691 (Tex. 1989) (citation omitted). The Court has already concluded that KBK has a superior right to that of Nebraska Beef for possession of the funds in question.

relation to Nebraska Beef's claim for money had and received, given that KBK has a superior security interest and is entitled to receive in the KBK lockbox all payments on any Red Oak invoices, there is no remaining genuine issue as to whether KBK holds money which in equity and good conscience belongs to Nebraska Beef and should be returned to it.[9] Such a conclusion is only strengthened by Nebraska Beef's own failure to protect its own interests.

Finally, there is no genuine issue remaining as to whether KBK misrepresented a material fact, meaning Nebraska Beef's claim for fraud is unsupportable.[10] Though there is no allegation as to what material fact KBK misrepresented to Nebraska Beef, the Court can only infer that it would be related to Nebraska Beef's allegations that the parties entered into an intercreditor agreement to remit to the other funds sent to the wrong lockbox. Not only is there no more than a scintilla of evidence regarding the existence of such an

---

[9] Money had and received is an equitable doctrine used to prevent unjust enrichment. *See Phippen v. Deere & Co.*, 965 S.W.2d 713, 725 n.1 (Tex. App. 1998, no writ); *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App. 1997, no writ). It "arises when one person obtains money that in equity and good conscience belongs to another." *Phippen*, 965 S.W.2d at 725 n.1. Although a plaintiff may base his right to recover on an express contract or an implied-in-fact contract, a claim for money had and received is not dependent upon either type of contract. *See City of Harker Heights, Tex. v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 317 (Tex. App. 1992, no writ); *Amoco*, 946 S.W.2d at 164. If a defendant is found to hold money that rightfully belongs to the plaintiff, a contract will be implied by law under which the defendant is obligated to return the money to the plaintiff. *See Amoco*, 946 S.W.2d at 164. Therefore, the sole inquiry for a court deciding a money had and received claim is whether the defendant holds money that, in equity and good conscience, belongs to the plaintiff. *See City of Harker Heights*, 830 S.W.2d at 317.

[10] In Texas, fraud occurs when: (1) the defendant misrepresented a material fact; (2) the defendant knew the material representation was false or made it recklessly without any knowledge of its truth; (3) the defendant made the false material representation with the intent that it should be acted upon by the plaintiff; and (4) the plaintiff justifiably relied on the representation and thereby suffered injury. *See United Teacher Assocs. Ins. Co v. Union Labor Life Ins. Co.*, 414 F.3d 558, 566 (5th Cir. 2005) (citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (2001)).

agreement (and such evidence is directed mostly if not entirely towards Nebraska Beef's intentions), but even if such an agreement existed its terms would only require KBK to remit to Nebraska Beef those funds to which Nebraska Beef is entitled. The Court has already concluded that Nebraska Beef is not entitled to demand remittance of the funds in question from KBK. Thus, even if the intercreditor agreement existed, KBK's actions in denying remittance of the funds in question would not constitute a *false* representation because KBK did not fail to remit funds to which Nebraska Beef has a superior title. There is therefore no genuine issue remaining as to whether KBK made a material misrepresentation.

Consequently, because a material element of each of Nebraska Beef's claims is negated by the existence of the KBK Agreement and KBK's prior perfected security interest in Red Oak's collateral, summary judgment in KBK's favor is appropriate.[11]

## IV. CONCLUSION

Therefore, Nebraska Beef's Motion for Summary Judgment [doc.

---

[11] The Court notes Nebraska Beef's argument that KBK waived its right to rest upon its security interest because KBK failed to plead that interest as an affirmative defense in its answer. Assuming, *arguendo*, that KBK's security-interest argument does constitute an affirmative defense, its failure to affirmatively plead that defense in its answer would not preclude KBK raising it at the summary-judgment stage: "Although failure to raise an affirmative defense under rule 8(c) in a party's first responsive pleading generally results in a waiver, where the matter is raised in the trial court in a manner that does not result in unfair surprise technical failure to comply precisely with Rule 8(c) is not fatal." *See Allianz Versicherungs, AG v. Profreight Brokers, Inc.*, 99 Fed. Appx. 10, 12 (5th Cir. 2004) (quoting *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 491-92 (5th Cir. 2001) (citing *Allied Chem. Corp.*, 695 F.2d at 855-56)) (internal quotation marks omitted) (footnote added). Though KBK did not affirmatively plead its security-interest argument, its answer did provide notice of that argument to Nebraska Beef. (Def.'s Answer 3, ¶ 14.) The Court deems this notice sufficient, and thus concludes that Nebraska Beef was not unfairly surprised by the argument. Consequently, KBK's technical failure is not fatal.

# 25] is DENIED.

Further, KBK's Motion for Summary Judgment [doc. # 27] is GRANTED.

SIGNED March 3, 2006.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE